UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) ) | Criminal No.: 19-10463-ADB |
| KAREN LITTLEFAIR, | ) ) ) | |
| Defendant | ) ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government submits this memorandum in advance of the July 15, 2020 sentencing of defendant Karen Littlefair. The government respectfully requests that the Court sentence Littlefair to four months of imprisonment, one year of supervised release, and a fine of $9,500.

## FACTUAL OVERVIEW

A. The Charged Fraud

Littlefair, a resident of Newport Beach, California, pled guilty to participating in a scheme to have individuals associated with William "Rick" Singer's Key Worldwide Foundation secretly take four classes on behalf of her son so that he could earn sufficient credits to graduate from Georgetown University, in Washington, D.C.

As set forth in the Pre-Sentence Report ("PSR"), the class-taking fraud began in the spring of 2017, after Littlefair's son was placed on academic probation by Georgetown. *See* PSR ¶¶ 37-40. Littlefair thereafter agreed with Singer and his employee, Mikaela Sanford,[1] to have classes taken on her son's behalf. From the outset, Littlefair knew that the scheme did not involve

---

[1] Singer and Sanford have been separately charged for their conduct. *See United States v. Singer*, 19-cr-10078-RWZ; *United States v. Ernst, et al.*, 19-cr-10081-IT-6.

obtaining tutoring or legitimate help for her son, but, instead, that Sanford or one of her associates would secretly act as a stand-in for him in order to deceive Georgetown faculty and staff into believing that he was completing his own coursework.

As an example, on June 4, 2017, when Sanford was beginning to take courses for Littlefair's son, Sanford sent an email to Littlefair: "I logged into the course [*i.e.*, Peace and Justice] earlier this evening and everything is accessible via the class portal. If you receive any emails please forward them along. Other than that we are all set and know where/how to begin." *See* Ex. A [Jun. 5, 2017 email chain]. Littlefair replied: "Perfect. Thank you! Will you be creating a new email for '[my son]' to submit work to the Prof? Maybe we can talk live tomorrow. I need to better understand how this works." *Id*. Sanford replied: "Yes, a new email account was created but in the event that [your son] does receive anything course related, please forward it along." *Id*.

As another example, in October 2017, Littlefair's son was required to meet with the Georgetown professor teaching his class either in-person or electronically. *See* PSR ¶ 41. Unbeknownst to the professor, the class was actually being taken by Person A, a woman who was hired by Sanford to complete the class for Littlefair's son. Person A wrote in an October 14, 2017 email that she had scheduled an appointment with the professor for October 20, 2017 via "skype or phone." *Id*. Person A asked Littlefair's son: "Are you able to speak with her at that time? If you are, I can prep you on the course and conversation with [the professor]. If you are not available, then I will be able to take care of the meeting with a fellow male colleague." *Id*. Littlefair responded: "How many face to face appointments are required? With [my son] headed to Saudi Arabia shortly, it seems to me that we should have a stand in for [my son] that is highly briefed by [Person A]. Probably sitting next to [Person A] at this appointment." Person A wrote back: "If [your son] is unavailable this upcoming Friday, then we can have a stand-in for his

appointment with the instructor. I'll brief this person but I'll be undetected by the professor." *Id*. Littlefair replied that she believed that a "stand in" was the "best idea." *Id*. However, Littlefair later had second thoughts, expressing concern to Singer about the possibility of getting caught, writing in an October 15, 2014 email:

> [My son] is concerned about Face Recognition and the Georgetown Data Base. He feels he should do the Face Time with the Professor. Apparently there's only one meeting like this. Makes me nervous but I guess if he gets briefed well? Your thoughts?

*See* Ex. B [Oct. 15, 2014 email]. Ultimately, Littlefair's son did the call himself from Saudi Arabia.

Littlefair later sought a discount on the fee Singer charged for the cheating because Person A did not earn as high a grade for her son as she wanted in a different online course at Arizona State University ("ASU"). *See* PSR ¶ 44. After Singer billed Littlefair $3,000 for the ASU course, Littlefair wrote in an email to Singer's accountant: "Kind of thought there would have been a discount on that one. The grade was a C and the experience was a nightmare." *Id*.

B. Additional Fraud

In addition to the fraudulent coursework, there is evidence that Littlefair facilitated her son's admission to Georgetown by fraud. *See id*. ¶¶ 49-50. As set forth in the PSR, a co-conspirator, Mark Riddell, took the ACT exam on behalf of Littlefair's son in December 2011 using a false identification card Singer provided him.[2] *See id*. ¶¶ 46-48. The result was to boost Littlefair's son's ACT score from 20 (approximately the 50th percentile) to 28 (approximately the 88th percentile). *See id*. ¶¶ 51 & 55.

---

[2] Riddell was separately charged and pled guilty for his involvement in Singer's scheme. *See* 19-cr-10074-NMG.

3

In addition, there is evidence that Littlefair made a payment of $200,000 to the Georgetown tennis program, in exchange for having the tennis coach, Gordon Ernst, give up an athletic recruitment spot to facilitate her son's admission. *See* PSR ¶¶ 58-64. Although Littlefair's son did not receive a "likely letter" designating him as a tennis recruit—as Ernst obtained for the children of numerous other Singer "side door" clients—the admissions process involved deception. *See, e.g., id.* ¶ 58. Littlefair's son's Georgetown application falsely depicted him as a top-ranked tennis player who was "regional and local[ly] ranked" and who played six hours of tennis each week. *Compare* Ex. C at 3 [Georgetown Application claiming Littlefair's son had four years of involvement with the United States Tennis Association ("USTA")], *with* Ex. D [USTA records show Littlefair's son had no involvement]; *see also* PSR ¶ 53. Littlefair understood that her son would be admitted using a tennis recruitment spot despite the fact that he was not a tennis player. *See* PSR ¶ 58. During a call with her son's high school guidance counselor on January 18, 2012, Littlefair told the counselor that Georgetown might call to inquire about his tennis skills. *See* Ex. E [counselor's notes of call]. Littlefair falsely told the counselor that her son had played tennis on club teams and country clubs. *See id.*; *see also* PSR ¶¶ 58-59.

## SENTENCING RECOMMENDATION

Littlefair's criminal conduct warrants a meaningful term of imprisonment.[3] Littlefair paid Singer more than $9,000 to have a third party secretly take classes for her son, knowing that the credits from those classes would enable her son to fraudulently obtain a degree from Georgetown. Littlefair was actively involved in the fraud, even debating with Singer's associate whether to use

---

[3] The government agrees with the PSR's calculation that the sentencing guidelines range is 0 to 6 months. The government respectfully submits that the adjusted offense level should be nine (and not seven as calculated in the PSR) because the gain to co-conspirators from the offense was more than $6,500 but not more than $15,000. *See* USSG § 2B1.1(b)(1)(B). With acceptance of responsibility, the total offense level under the government's calculation is seven.

a "stand in" to trick a Georgetown professor. And when Littlefair felt that she did not receive her money's worth because her co-conspirator received a low grade, she demanded a discount. In addition, as set forth above, there is considerable evidence that Littlefair employed fraud to secure her son's admission to Georgetown in the first place, through cheating on his college entrance exam and the fraudulent use of a tennis recruitment spot even though he did not play tennis.

A four-month term of imprisonment is comparable to the sentences imposed on similarly situated defendants in the college admissions cases who pled guilty prior to indictment. For example, several defendants who pled guilty to participating in Singer's scheme by cheating on college entrance exams were sentenced to terms of several weeks to one month in prison. *See, e.g., United States v. Abbott, et al.,* 19-cr-10117-IT (defendant Jane Buckingham sentenced to three weeks in prison after agreeing to pay $50,000 to have Riddell take the ACT exam on behalf of her son); (defendant Gordon Caplan sentenced to one month in prison after paying $75,000 to have Riddell correct answers on his daughter's ACT exam); (defendant Marjorie Klapper sentenced to three weeks in prison after paying $15,000 to have Riddell correct answers on her son's ACT exam). Others were sentenced to terms of four months and above for participating in the scheme by bribing college coaches through donations to university athletic programs to purport to recruit their children as athletes based on false or exaggerated credentials. *See, e.g., id.* (defendant Stephen Semprevivo sentenced to four months after paying $400,000 to have Ernst designate his son as a purported tennis recruit); (defendant Devin Sloane sentenced to four months after paying $250,000 to have his son "recruited" by the University of Southern California ("USC") as a fake water polo player); *see also* 19-cr-10222-DPW (defendant Jeffrey Bizzack sentenced to two

months after paying $250,000 to have his son "recruited" by USC as a fake volleyball player).[4]

Compared with these defendants, Littlefair's conduct ranks with those who have been sentenced to longer terms of incarceration.  In contrast to defendants who participated in the scheme by cheating on a single test, Littlefair participated in *multiple* aspects of the scheme: cheating on the admissions exam, falsifying her son's tennis credentials, *and* having someone take his classes to earn credits toward his graduation.  Her conduct occurred over an extended period.  Indeed, she paid Singer to have co-conspirators take *four* classes on her son's behalf, over a nearly one-year period.  Unlike those whose involvement was relatively minimal—because, for example, they paid Singer to carry out the scheme without involving themselves in its details—Littlefair took an active role, discussing details and mechanics of the fraud with her co-conspirators.  She allowed her son to be complicit in the fraud, thus exposing him to its potential consequences.  And the scheme was blatantly fraudulent.  It allowed her son to gain admission to Georgetown at the expense of another candidate, and to receive a Georgetown degree that he did not earn.  At the same time, Littlefair merits consideration for accepting responsibility for at least some of her conduct in a timely way—prior to Indictment—and thereby sparing the government, and the Court, the resources attendant to arrest and prosecution.

---

[4] Unlike Littlefair, Bizzack, approached the government about pleading guilty before he was even advised that he was the subject of a government investigation.  In addition, one parent defendant has, to date, been sentenced to a non-incarceratory term.  That defendant, Peter Sartorio, was less culpable than Littlefair.  He agreed to pay Singer $15,000 in cash to have Riddell correct the answers on a single ACT exam.  The government has also recommended a non-custodial sentence for defendant Peter Dameris, who pled guilty to paying Singer to secure his son's admission to Georgetown through bribery and fraud.  *See* 20-CR-10099-RGS.  As set forth in that plea agreement, however, the government's recommendation is based on "serious documented medical conditions involving [Dameris's] close family members."  Dameris has not yet been sentenced.

For these reasons, the government respectfully submits that a sentence of four months of imprisonment appropriately reflects the seriousness of Littlefair's crime, serves the interests of general and specific deterrence, and avoids an unwarranted disparity with the sentences imposed on other defendants who are similarly situated.

## CONCLUSION

The government respectfully recommends a sentence of four months of imprisonment, a fine of $9,500, one year of supervised release, and a $100 special assessment.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: */s/ Eric S. Rosen*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
KARIN M. BELL
STEPHEN E. FRANK
Assistant United States Attorneys

Date: July 8, 2020

**CERTIFICATE OF SERVICE**

      I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by CM/ECF on July 8, 2020.

                                                   */s/ Eric S. Rosen*
                                                   ERIC S. ROSEN