UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

           Plaintiff,

    v.

KAREN LITTLEFAIR,

           Defendant.

Case No.: 1:19-cr-10463-ADB

## **DEFENDANT'S SENTENCING MEMORANDUM**

In 2017 and 2018, Karen Littlefair ("Ms. Littlefair") paid a total of $9,000 for someone to complete 12 units of online college courses in place of her son to facilitate his graduation from Georgetown University. She waived indictment and timely pleaded guilty to a one count information charging her with such conduct under 18 U.S.C. §§ 1349 and 1343 (conspiracy to commit wire fraud). The Presentence Investigation Report ("PSR") correctly calculates that Ms. Littlefair's Total Offense Level is 5, her criminal history score is zero, and the advisory guideline range is 0 to 6 months.

Ms. Littlefair comes before this Court with genuine remorse for her actions, acknowledging her misconduct and accepting full responsibility for the instant offense. Based upon Ms. Littlefair's personal history and character, continuing health vulnerabilities, service to others and her community, and the critical need to avoid sentencing disparities, she respectfully requests that this Court exercise its discretion to impose a sentence of probation, including a condition of home confinement. Such a sentence is consistent with the central mandate of 18 U.S.C. § 3553(a), which requires that a sentence be "sufficient, but not greater than necessary" to reflect the seriousness of the offense, affect deterrence, and protect the public.

## I.    <u>Background</u>

Ms. Littlefair's background is set forth in the PSR.[1] Additional details of her life are described more fully in this memorandum and accompanying letters.[2] In sentencing, Ms. Littlefair requests that this Court consider the entirety of her life: her dedication to her family and care for elderly mother and mother-in-law; her battle with breast cancer and continuing vulnerabilities; her service to others and her community; and the important fact that, at age 57, she has had no criminal history of any kind. A sentence of probation, in addition to being appropriate, would allow Ms. Littlefair to continue to care for her family members and avoid exposing her to viral infections and potential life-altering complications to which she is especially vulnerable.

### A.    **Ms. Littlefair's Family Members Rely On Her For Care And Support.**

Ms. Littlefair was raised by two loving parents. Her father, Ernest, was an orthodontist with a solo office in Montebello, California, and her mother, Gloria, raised four children. "Coming from an active Italian family once led by her father, family means everything. Ernie and Gloria instilled in [Ms. Littlefair] and her siblings the true meaning of family. [Ms. Littlefair] is the glue that holds [her extended] ... famil[y] together and functioning."[3] Ms. Littlefair has a sister, Christina; a brother, Anthony; and an adopted sister, Lucy, who was a distant relative from Sicily, Italy that Ernest and Gloria raised since age 13 as one of the family. Ms. Littlefair married her college sweetheart, and together they have two sons, aged 26 and 29.[4]

Ms. Littlefair became a critical part of the daily lives of her mother, sister, and mother-in-law after several difficult losses and unfortunate health issues. In September 2013, her father

---

[1]  All cites to the PSR are to the revised PSR with addendum dated July 8, 2020.
[2]  Letters of knowledgeable friends, neighbors, and community members are attached collectively hereto as Exhibit A. Letters from Ms. Littlefair's physicians are attached collectively hereto as Exhibit B.
[3]  Letter of Lisanne Laraneta-Watson ("Laraneta-Watson Ltr."), Affidavit of Kenneth B. Julian in Support of Defendant's Sentencing Memorandum ("Julian Aff."), Ex. A, Tab 1 at 1.
[4]  PSR, ¶ 96.

passed away at 77 from heart disease after a lengthy illness.[5] During this tough and emotional time, Ms. Littlefair oversaw the selling of the family home, packed up her mom, and moved her within minutes of her own home.[6] Ms. Littlefair's sister, Christina, states that "[o]ur mom [] turn[ed] 82 [in] January [2020]. I'm eternally grateful for having my sister be the one that my mom leans on and turns to for help. Karen is with mom daily and makes sure she gets everywhere she needs to go. She ensures my mom is safe and comfortable at all times. Our mom relies heavily on Karen."[7] The PSR notes that Ms. Littlefair is "close with her mother and she sees or talks with her daily."[8]

In December 2015, Christina's husband, Tim Newman, a 27-year veteran and retired Captain with the Newport Beach Police Department, died at 62—just two months after being diagnosed with a rare brain disease.[9] Thus, "[w]hile [she] was providing emotional support for her mother, [Ms. Littlefair's] brother-in-law ... passed away suddenly, leaving everyone, especially her sister [Christina], paralyzed and thus adding another unbearable task to undertake."[10] Christina states: "Clearly, my heart was shattered to lose my father, and then quickly the love of my life, my husband. My sister raced to our sides and quickly took over carrying the weight of our entire family."[11] Ms. Littlefair "step[ped] in and step[ped] up with so much courage, passion and purpose during such an enormous time of heartache and loss. Karen became my ROCK and the backbone of our entire family. She has shown both grace and grit

---

[5] Id., ¶ 91.
[6] Laraneta-Watson Ltr., Julian Aff., Ex. A, Tab 1 at 1; Letter of Roberta Fesler ("Fesler Ltr."), Julian Aff., Ex. A, Tab 5 at 4.
[7] Letter of Christina Newman ("Newman Ltr."), Julian Aff., Ex. A, Tab 2 at 1.
[8] PSR, ¶ 92.
[9] Id., ¶ 93.
[10] Laraneta-Watson Ltr., Julian Aff., Ex. A, Tab 1 at 1.
[11] Newman Ltr., Julian Aff., Ex. A, Tab 2 at 1.

through it all."[12] Christina is still fragile and recovering, and continues to participate in a grief program, and Ms. Littlefair talks with her daily.[13]

Ms. Littlefair also helps care for her 94 year-old mother-in-law, Marion, who suffers from serious health issues and lives close by. Ms. Littlefair's sister, Lucy, lives with Marion, as a caregiver. Ms. Littlefair schedules and transports Marion to her frequent doctor visits, physical therapy, and ongoing care.[14] According to Lucy, Ms. Littlefair is a "consistent and loving part of all our daily lives.... I look to her almost daily for advice, counsel, friendship and help. All of us, me, Gloria and Marion, depend on [her]."[15]

The family's physician, Martin Bae, M.D., reports: "I am the physician for Karen's mother, sister, and mother-in-law. I have seen Karen through the loss of her father as well as her sister's husband. She is the person who coordinates her mother-in-law's healthcare. Karen takes care of the whole family with a great deal of love and compassion."[16] A knowledgeable, longtime friend and neighbor states that Ms. Littlefair's "mother-in-law and her mother are elderly and depend upon Karen extensively. They each live very close to Karen, and she is deeply involved in addressing their needs. Even a brief incarceration would have a significant negative impact on them and be disruptive to their daily lives."[17] Another knowledgeable friend observes: "It is inspirational to see how Karen takes care of her elderly mother who lives close to her. She and her mother have a very close relationship, and Karen not only takes care of her physical needs but also includes her mother in as many activities as possible, takes her to visit

---

[12] *Id.*
[13] PSR, ¶ 93.
[14] Letter of Diana Miner ("Miner Ltr."), Julian Aff., Ex. A, Tab 3 at 2.
[15] Letter of Lucy Sansosti ("Sansosti Ltr."), Julian Aff., Ex. A, Tab 4 at 1.
[16] Letter of Dr. Bae, dated 1/14/2020 ("Dr. Bae Ltr. I"), Julian Aff., Ex. B, Tab 1 at 1.
[17] Fesler Ltr., Julian Aff., Ex. A, Tab 5 at 2.

relatives, even takes her on short trips just for pleasure. It would be devastating to her mother if Karen wasn't able to be with her."[18]

**B.     Ms. Littlefair's Battle With Breast Cancer, Continuing Vulnerabilities, And Use Of That Experience To Help Others.**

**1.     Battle With Breast Cancer And Continuing Vulnerabilities**

In 2007, at the age of 43, Ms. Littlefair was diagnosed with breast cancer.[19] When Ms. Littlefair was diagnosed, "[h]er biggest concern was not to burden her family with this news."[20] Her oncologist, Louis A. VanderMolen, M.D., reports that she "underwent surgery, radiation, as well as prolonged course of hormone therapy ...."[21] According to Dr. Bae, Ms. Littlefair took breast cancer treatment drugs for five years.[22] Dr. VanderMolen notes that "[d]espite previous systemic therapy, [Ms. Littlefair] continues to remain at risk for disease recurrence."[23]

Additionally, because of "[p]rolonged effects on the immune system due to radiation therapy," Ms. Littlefair is "at risk for infection, particularly virus infections," and one potential viral infection of concern is COVID-19.[24] Dr. VanderMolen states that "ample literature ... shows *cancer survivors* are more likely to experience severe events after contracting COVID-19 including requirement for mechanical ventilation, admission to intensive care and death."[25] This concern was validated by a recent medical study, which found: "*Cancer history* represented the highest risk for severe events" from COVID-19.[26]

---

[18]  Letter of Janice Hawthorne ("Hawthorne Ltr."), Julian Aff., Ex. A, Tab 6 at 1.
[19]  PSR, ¶¶ 89, 107.
[20]  Letter of Linda Phillips ("Phillips Ltr."), Julian Aff., Ex. A, Tab 7 at 2.
[21]  Letter of Louis A. VanderMolen, M.D. ("Dr. VanderMolen Ltr."), Julian Aff., Ex. B, Tab 2 at 1; *see also* PSR, ¶ 107.
[22]  Letter of Martin Bae dated 5/28/20 ("Dr. Bae Ltr. II"), Julian Aff., Ex. B, Tab 3 at 1.
[23]  Dr. VanderMolen Ltr., Julian Aff., Ex. B, Tab 2 at 1; *see also* PSR, ¶ 107.
[24]  *Id.*
[25]  Dr. VanderMolen Ltr., Julian Aff., Ex. B, Tab 2 at 1 (emphasis added).
[26]  *See* Allison Landman, et al., *Cancer Patients in SARS-CoV-2 Infection: A Nationwide Analysis in China*, The Lancet Oncology (2020), Julian Aff., Ex. C, Tab 1 at 2 (emphasis added).

Dr. VanderMolen reports that, "[o]f note, Mrs. Littlefair's radiation was delivered to the chest wall," and that "COVID-19 patients with a history of radiation have a poor prognosis and increased mortality *associated with radiation delivered to the chest and chest wall* as well as immunosuppressive effects."[27] Thus, Ms. Littlefair's susceptibility to viral infections, including COVID-19, is of vital concern. Dr. Bae points out that the "known infection rate for COVID-19 is about 2.5 times higher in jails and prisons than in the general population."[28] The same is true for other viral infections, as rates of infectious diseases in prisons, "particularly blood-borne *viral infections* ... and airborne infections ... are typically higher than in the general community which exacerbates the risk of disease transmission."[29]

Stress is another concern. Research shows that "close physical proximity in prisons may induce psychological stress ...."[30] Ms. Littlefair currently takes medication daily to "ease her stress and anxiety surrounding her condition and treatment."[31] Dr. VanderMolen states that "it has [been] identified that stress can also cause impairment with her immune function leading to increased risk for cancer recurrence,"[32] and, thus, in his "opinion ... Mrs. Littlefair [would] be better served with home confinement in a setting where she could limit stress, but also avoid exposure to COVID-19 and be vulnerable to the consequences thereof."[33] Dr. Bae echoes that "[h]ome confinement would be a much safer option" for Ms. Littlefair.[34]

---

[27] Dr. VanderMolen Ltr., Julian Aff., Ex. B, Tab 2 at 1 (emphasis added); *see also* PSR ¶ 107.
[28] Dr. Bae Ltr. II, Julian Aff., Ex. B, Tab 3 at 1.
[29] Paul L. Simpson, et al., *Prison Cell Spatial Density and Infectious and Communicable Diseases: A Systemic Review*, BMJ Open (2019), Julian Aff., Ex. C, Tab 2 at 2. (emphasis added).
[30] *Id.*
[31] PSR, ¶ 107.
[32] Dr. VanderMolen Ltr., Julian Aff., Ex. B, Tab 2 at 1.
[33] *Id.*
[34] Dr. Bae Ltr. II, Julian Aff., Ex. B, Tab 3 at 1.

### 2.    Ms. Littlefair Used Her Experience With Cancer To Help Others

While she was undergoing cancer treatment, Ms. Littlefair found time to help others. "Even when Karen was ... having some really bad days due [to] the effects of her [treatment], there were many days that she would hear about someone being in need and she would find a way to help them out."[35] "Karen was extremely exhausted from her [c]ancer and the treatments when she realized that there was a need to fill for other people going through cancer at the [treatment] facility," and "she got together with her family and friends and raised funds to see those who were suffering and/or in pain would be made more comfortable."[36] Once she recovered, Ms. Littlefair "became committed to raising funds" for the local cancer center that treated her.[37] "[F]or the last 15 years," Ms. Littlefair has organized and chaired an annual fundraiser, raising "over $200,000 [for] the cancer center."[38]

Additionally, for "several friends ... diagnosed with cancer," Ms. Littlefair "prepar[ed] meals and spen[t] time with them during their treatments."[39] One friend states that Ms. Littlefair was a "[c]aregiver, and support to [his] wife Bitsy through her breast cancer battle, as Karen a survivor herself showed empathy, love, and guidance."[40] For another friend, Ms. Littlefair was "with her every step of the journey" and "throughout many milestones of her illness," until early December 2019, when she unfortunately passed away from brain cancer.[41]

Ms. Littlefair did the same for a neighbor, who later became a close friend. When she learned that the neighbor, who had two young boys, "developed several autoimmune diseases

---

[35] Letter of Vincent Adams ("Adams Ltr."), Julian Aff., Ex. A, Tab 8 at 1.
[36] *Id.*
[37] Fesler Ltr., Julian Aff., Ex. A, Tab 5 at 1.
[38] Phillips Ltr., Julian Aff., Ex. A, Tab 7 at 2.
[39] Miner Ltr., Julian Aff., Ex. A, Tab 3 at 2.
[40] Letter of John Clemens ("Clemens Ltr."), Julian Aff., Ex. A, Tab 9 at 2.
[41] Letter of Raymond Bustamante ("Bustamante Ltr."), Julian Aff., Ex. A, Tab 10 at 1.

and was unable to leave the house," Ms. Littlefair was the "first to arrange a Meal Train."[42] Ms. Littlefair also "alerted women to pray and she made sure [the] family was covered. She networked people together to help [the neighbor] cope under the new health circumstances which changed [the neighbor's] life."[43] Another neighbor and friend states that when her "husband was diagnosed with head and neck cancer," Ms. Littlefair "contacted every doctor she knew from New York to Los Angeles helping to find the best treatment for [her] husband."[44]

### C.   Ms. Littlefair's Service To Others In Need.

Ms. Littlefair "does her good works quietly without a lot of fanfare and not for public recognition or to enhance her social position."[45] One knowledgeable friend states: "[t]hroughout the last ten years, I have witnessed Karen give of herself to so many. I have seen her give love and compassion to strangers, pray with people who are hurting and have seen her be an integral part of her community and church. Her kindness has helped so many."[46] Another friend observes: Ms. Littlefair has a "heart for serving others; especially those in need," and she is "quick to see or hear of a need and figure out a way to help those in need."[47]

Ms. Littlefair's sons attended Mater Dei High School in Santa Ana, California, her sons played football, and she was one of the team moms. The football coach describes, "[d]uring the grueling two-a-day practices she organized snacks and drinks for the players. Behind the scenes, anonymously, she also provided lunches for the players less fortunate. Karen opened the Littlefair home for dinner and housing to cut down long distance commute time for players who lived further away."[48] A fellow team mom describes how Ms. Littlefair "led a group of Mothers

---

[42]  Miner Ltr., Julian Aff., Ex. A, Tab 3 at 1.
[43]  *Id.*
[44]  Letter of Lauren Mintie ("Mintie Ltr."), Julian Aff., Ex. A, Tab 11 at 1.
[45]  Hawthorne Ltr., Julian Aff., Ex. A, Tab 6 at 1.
[46]  Letter of Rocio Griley ("Griley Ltr."), Julian Aff., Ex. A, Tab 12 at 1.
[47]  Adams Ltr., Julian Aff., Ex. A, Tab 8 at 1.
[48]  Letter of Bruce R. Rollinson ("Coach Rollinson Ltr."), Julian Aff., Ex. A, Tab 13 at 1.

in a prayer before each football game. We prayed for not only our children but for all of the young men playing proudly for their high schools, and we prayed for all of the families. It was a pretty incredible thing to witness and be a part of ...."[49] Although her sons have long graduated, Ms. Littlefair "still raises money" for Mater Dei, "a private catholic high school [where] 55% of the students require financial aid."[50]

Another friend describes how Ms. Littlefair was there for her during an "unimaginable tragedy," when her oldest son was "playing in his first collegiate baseball game at Arizona State University suffered a C-6 spinal cord injury while sliding into second base."[51] "[O]ne of the first calls I received was from Karen .... [S]he took [our other son] in with her family while my husband and I spent 7 days at [a neurological institute] in Phoenix trying to figure out what to do next."[52] Ms. Littlefair "reached out to Casa Colina Rehabilitation Hospital in Pomona, California to arrange for [my oldest son] to be cared for by one of the best spinal trauma centers and for him to be treated by their top physicians" and, when it was learned that the young man would be paralyzed from the chest down, Ms. Littlefair helped raise funds to meet his medical needs.[53]

Finally, on a trip to Kenya in 2016, Ms. Littlefair struck up a friendship with a young Masai man, "Ritchie," who had just finished high school. He was the youngest of 14 children, and life had been hard for him. Despite knowing him for a short time, Ms. Littlefair and her husband paid for Ritchie's education at the "[U]niversity in Nairobi, the capital city of Kenya, and ... paid for all his living expenses."[54] Ms. Littlefair and Ritchie remain close and in regular contact. A recent note from Ritchie reads: "My last semester results Mum, I received the parcel

---

[49]  Griley Ltr., Julian Aff., Ex. A, Tab 12 at 1.
[50]  Letter of Jenna Roman ("Roman Ltr."), Julian Aff., Ex. A, Tab 14 at 2.
[51]  Letter of Christine Hahn ("Hahn Ltr."), Julian Aff., Ex. A, Tab 15 at 1.
[52]  *Id.*
[53]  *Id.*
[54]  Letter of Valerie Botta ("Botta Ltr."), Julian Aff., Ex. A, Tab 16 at 1.

and the suits, shirts and the shoes were the best. God bless you so much. Am grateful for your love and care."[55]

## II.   The Plea Agreement, Instant Offense And Context, And Uncharged Conduct And Corresponding Exculpatory Facts

### A.   The Plea Agreement.

Ms. Littlefair took early responsibility for the instant offense. During the government's investigation, Ms. Littlefair cooperated with informal requests for information, and participated (through counsel) in multiple substantive meetings, including a meeting with federal agents. She later entered into the plea agreement, pleaded guilty, and admitted the facts contained in the operative information; namely, that she paid a total of $9,000 between June 2017 and May 2018 for an employee of Rick Singer ("Mr. Singer") to take 12 units of online college courses in place of her son and to submit the credits to Georgetown. In the plea agreement, the government agreed to recommend four months' imprisonment, a fine of $9,500, and 12 months of supervised release, and Ms. Littlefair preserved her ability to argue for a lower sentence.

### B.   The Instant Offense And Context.

Ms. Littlefair's son has struggled with a non-verbal learning differences since he was diagnosed at age 6.[56] He was later diagnosed with processing, reading, and writing weaknesses, and must expend a "tremendous amount of effort" to overcome his "learning difficulties."[57] By May 2016, he had attended Georgetown for four years, and had successfully completed all courses for his major in Government, but walked the stage at graduation 12 elective units short of his degree.[58] This shortage was not for lack of hard work; rather, it mainly stemmed from a decision to attend the University of Virginia's Semester at Sea Program, when Georgetown did

---

[55] Email from Ritchie Ole K. ("Ritchie K. Email"), Julian Aff., Ex. K.
[56] PSR, ¶ 100.
[57] *Id.*
[58] *See id.*, ¶ 101.

not accept such coursework for academic credit.[59] He planned to make up extra units in his final year; however, handling extra units on top of his other required classes proved to be too much, leading to an unsuccessful final semester. He also failed complete required administrative processes to receive credit for one three-unit course and two prior formal internships.[60]

In June 2016, Georgetown placed Ms. Littlefair's son on one year of academic probation and required him to take a year off before completing additional course work.[61] In February 2017, as the academic probation period neared completion, Ms. Littlefair attempted to assist her son in finding online courses acceptable to Georgetown. Online courses were necessary because her son was to begin work in early 2017 as an advance staffer for the U.S. Treasury Department, a demanding position that would require long hours and frequent domestic and international travel.[62] When the course selection task proved daunting, Ms. Littlefair reached out to Mr. Singer "for *legitimate* assistance" identifying online classes that Georgetown would accept, and advice about petitioning it to accept for credit past work her son had already completed.[63]

In the ensuing months, it became apparent that the demanding new position, extensive travel, and extra time required due to his learning difference, would make it extremely difficult for her son to participate in the online courses. As a solution, Mr. Singer proposed that one of his employees take the online classes in place of her son. To her great shame and regret, Ms. Littlefair agreed and carried out this unlawful proposal.

---

[59] Ms. Littlefair's son successfully earned *9 units* in connection with the Semester at Sea Program through the University of Virginia. *See* University of Virginia Transcript, Julian Aff., Ex. D; *see also* PSR, ¶ 101.

[60] Ms. Littlefair's son completed the work for a *3-unit* bioethics course, and received an "F" for failing to timely submit one or more papers due to technical issues. After hearing his explanation, the professor requested the grade be changed to a passing grade. *See* Julian Aff., Ex. E, Tab 1 at 1. This request was denied by the academic dean for insufficient proof that the son was "locked out of [his] Georgetown email account." *See* Julian Aff., Ex. E, Tab 2 at 1. Ms. Littlefair's son also completed two internships, one for a key congressman and another for a state governor, but he neglected to file the paperwork required to earn *one unit* of credit for which he was eligible. *See* PSR, ¶ 101.

[61] PSR, ¶¶ 37, 101.

[62] *Id.*, ¶ 101.

[63] *Id.* (emphasis added); *see also* Julian Aff., Ex. J, Tabs 1-2.

### C.     The Uncharged Conduct And Corresponding Exculpatory Evidence.

During its investigation of college preadmissions-related conduct, the government received from Ms. Littlefair (and Mr. Singer) substantial exculpatory evidence showing that she was unaware of Mr. Singer's unlawful activities as a college counselor on behalf of her son. After receiving this evidence, the government did not charge Ms. Littlefair with any preadmissions-related conduct, and instead drafted a narrowly drawn information alleging a conspiracy between 2017 and 2018 based only upon academic cheating. Ms. Littlefair anticipates, however, that the government may emphasize at sentencing *uncharged* preadmissions-related conduct from *2011* and *2012*, five to seven years before the instant offense. It would be unfair to do so.

The government only recently disclosed statements of Mr. Singer that tended to exculpate Ms. Littlefair regarding major aspects of the preadmissions-related conduct, including: (1) that "[Ms.] Littlefair *did not know* that [her son] was getting admitted to Georgetown through its *tennis program*," and (2) that he "advised [Ms.] Littlefair that he was *friends* with Georgetown tennis coach Gordie Ernst," and that "Ernst was helping her son."[64] Moreover, according to Mr. Singer, when he solicited a monetary donation through his foundation, Ms. Littlefair "*thought the money was going to be paid to Georgetown*."[65]

Ms. Littlefair learned about these exculpatory statements for the first time in February 2020 when she received a draft of the government's proposed offense conduct (the "GPOC") to be submitted to probation in connection with this sentencing. She requested the "back-up" materials for the uncharged conduct set forth in the GPOC, but that request was largely denied

---

[64] PSR, ¶ 58 (emphasis added).
[65] *Id.* (emphasis added).

on the grounds that her case was resolved via an information and plea agreement.[66] Thus, it would be unfair for the government, for example, to base sentencing arguments about the uncharged conduct upon prior statements of Mr. Singer, when the government provided Ms. Littlefair with *none* of the 302s for Mr. Singer memorializing those statements. Ms. Littlefair highlights below a few key points relating to the uncharged pre-admissions-related conduct.

Ms. Littlefair showed the government documents during its investigation of the pre-admissions conduct that corroborate the recently disclosed exculpatory information. For example, Mr. Singer's assertion that Ms. Littlefair *lacked* knowledge that he had submitted her son as a tennis recruit was corroborated by a letter she wrote to the Georgetown *crew coach* in May 2012, after her son was accepted, stating: "[My son] … is *concerned about not belonging to a team for the first time in years* ... [and] would love to hear more about your program and what it takes to walk on, time commitment, etc."[67] Additionally, Ms. Littlefair shared multiple communications from Georgetown regarding her son's application and acceptance—*none* of these mentioned tennis or athletics in any way.[68] The corrupted application Mr. Singer submitted to Georgetown also badly misspelled her son's middle name "Ernest" (also, her father's name), as "Ernerst," which certainly would have caught Ms. Littlefair's eye had she seen it.[69]

Further, Ms. Littlefair showed the government private communications—written before any motive to fabricate—in which she pondered why there was no receipt for the "*contribution*" to Georgetown, demonstrating that she believed that a legitimate donation benefiting Georgetown had been made.[70] She wrote: "[B]e firm about receiving a letter *acknowledging a gift* to either Georgetown or [Mr. Singer's] Foundation. I doubt we will ever receive credit *for*

---

[66] Julian Aff., ¶¶ 2-4.
[67] Email from Ms. Littlefair, Julian Aff., Ex. F (emphasis added).
[68] PSR, ¶ 60.
[69] *Id.*, ¶ 53.
[70] Email from Ms. Littlefair, Julian Aff., Ex. G (emphasis added).

*our gift in the normal world of development for GT*, although it seems ridiculous that we can't. Why can't Gordy [Ernst] generate a letter?"[71] After-the-fact, Mr. Singer represented that the donation *was* used to support Georgetown's tennis program.[72]

As to the issue of ACT cheating, Mr. Singer admits signing-up for the bogus ACT test, using his own personal Gmail address.[73] He admits lying to Ms. Littlefair's son about why he needed a copy of his high school ID (to make an admissions video or "movie"), and stated that the son "must have told" this deceit to Ms. Littlefair ...."[74] There is zero evidence that Ms. Littlefair was aware of, or participated in, any of the usual parent-involved logistics to arrange ACT cheating. Instead, the government attributes Ms. Littlefair's singular "payment to Singer in the amount of *$3,035*" to ACT cheating—but, this odd sum is more consistent with fees and expenses for college counseling services, and is not likely to have raised any "red flags" that ACT cheating was afoot, especially when compared with the usual payments of *$15,000* to *$75,000* Mr. Singer charged other parents for such SAT/ACT cheating.[75]

Without specifying, Mr. Singer claims that "Karen Littlefair *would have known* that Singer was *doing something* to get [her son] a score."[76] But, in October 2018, when he made a recorded telephone call to Ms. Littlefair at the direction of the FBI, Mr. Singer—*inexplicably* if

---

[71] *Id.* (emphasis added).

[72] *See, e.g.*, PSR, ¶ 62 ("[E]ssentially what I had to do was pay the Georgetown program expenses ... [s]o when the team made a trip for training, i.e. Hawaii etc for a couple weeks they had to pay the expenses outside of their university funding so I got the bill and paid. Expenses like what were taken care of and accounted for. The compensation came in lieu of camp income and those on staff were paid additionally but as contractors through my company.").

[73] *Id.* ¶ 52 (rwsinger@gmail.com).

[74] *See id.*, ¶ 56; *see also* GPOC, Julian Aff., Ex. H at 6.

[75] PSR, ¶ 59 (Ms. Littlefair "sent a payment to Singer in the amount of $3,035, which appears to have been a payment for the ACT exam."). Nor does the $3,035 payment square with the fact that "Singer ... paid [test taker] Riddell approximately $10,000 per exam." *See id.*, ¶ 30(d) ($10,000 per exam paid to test taker Riddell).

[76] PSR ¶ 56; *see also* GPOC, Julian Aff., Ex. H at 6. As to the speculative nature of Mr. Singer's statements regarding Ms. Littlefair's knowledge of ACT cheating, s*ee, e.g.*, PSR, ¶¶ 50 ("may have ... told") and 56 ("would had to have known," "would have known," "believes").

she was actually in on it—made *no mention* of ACT cheating.[77] Instead, he attempted to induce

her to affirm his statement that "$200,000 went to *Gordie Ernst* in Georgetown tennis," when

Mr. Singer knew (as he *later* told the government) that Ms. Littlefair "thought the money

[donated] was going to be *paid to Georgetown*" and "*did not know* that [her son] was getting into

Georgetown through tennis ...."[78] That is, in *2012*, Mr. Singer indicated that the donation he

solicited through his foundation was being *paid to Georgetown*; in *2013*, he represented that the

donation *was* used to support *Georgetown's tennis program*; but, on the recorded call in *2018*, he

seemingly tried to get Ms. Littlefair to agree that it was *paid to the tennis coach* instead.[79]

On the other hand, when Mr. Singer mentioned the "charitable donation" to his

foundation on the call, Ms. Littlefair straightforwardly responded "that's *pretty easy to track*, if

... they *looked at our records* ...."[80] For good and just reasons, the government elected not to

charge Ms. Littlefair with any preadmissions-related conduct—thus, it should not be the tail that

wags the dog at sentencing.

## III.   Based On The Unique Factors Of Ms. Littlefair's Case, A Sentence Of Probation Is Sufficient But Not Greater Than Necessary Under 18 U.S.C. 3553(a)

Consistent with *Booker* and 18 U.S.C. § 3553(a), and based on the unique circumstances

of Ms. Littlefair's case, this Court should impose a sentence of probation because it is sufficient,

but not greater than necessary, to achieve the purposes of sentencing set forth in § 3553(a). *See*

*United States v. Booker*, 543 U.S. 220, 245 (2005) (holding that the sentencing guidelines are

advisory, not mandatory). After *Booker*, courts may "impose non-guideline sentences that

---

[77]  Government's Call Transcript, Julian Aff., Ex. I; *see also* PSR, ¶ 64.

[78]  PSR, ¶ 64 (emphasis added); *id.*, ¶ 58 (emphasis added).

[79]  *See* PSR, ¶¶ 58, 62, 64. Singer's call with Ms. Littlefair occurred on *October 30, 2018*, and it appears that Singer did not provide the government with the quoted exculpatory evidence concerning Ms. Littlefair's lack of knowledge until two days later, on *November 1, 2018*. *See* GPOC, Julian Aff., Ex. H at 7 ("On November 1, 2018, Singer told investigators additional information ... Littlefair paid through the Key Worldwide Foundation and *thought the money was going to be paid on to Georgetown*.") (emphasis added).

[80]  PSR, ¶ 64 (emphasis added); Government's Call Transcript, Julian Aff., Ex. I at 4 (emphasis added).

override the guidelines, subject only to the ultimate requirement of reasonableness." *United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006), *abrogated on other grounds*, 551 U.S. 338 (2007). Here, because Ms. Littlefair's guideline range is 0-6 months, a sentence of probation with a condition of home confinement is *within* the advisory range.

In crafting an appropriate sentence, the court must "weigh the factors enumerated in 18 U.S.C. § 3553(a), and custom-tailor an appropriate sentence." *United States v. Flores-Machicote*, 706 F.3d 16, 20 (1st Cir. 2013). The sentencing court is afforded "very broad" discretion, *United States v. Prosperi*, 686 F.3d 32, 42 (1st Cir. 2012), and "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008). As stated by the Court of Appeals for the First Circuit:

> [S]entencing necessitates a case-by-case approach, the hallmark of which is flexibility. Accordingly, a sentencing court should not consider itself constrained by the [sentencing] guidelines to the extent there are sound, case-specific reasons for deviating from them.

*Prosperi*, 686 F.3d at 42 (internal citations and quotations omitted).

Here, the § 3553(a) factors overwhelmingly favor a sentence of probation. At age 57, Ms. Littlefair is a zero-point offender and is a cherished family member, friend, and member of her community. Her offense occurred during and after a prolonged period of grief and personal stress. She took the earliest opportunity to plead guilty to the instant offense. The curse of carrying around a felony conviction is a significant punishment and deterrent that promotes respect for the law. Furthermore, a sentence of probation is consistent with other sentences for comparable defendants found guilty of similar conduct in the District of Massachusetts.

A. **Nature And Circumstances Of The Offense.**

Since her son was very young, Ms. Littlefair has assumed primary responsibility for dealing with medical and academic issues relating to her son's learning differences. She continued to assist with these issues while her son attended Georgetown between 2012 to 2016. During this time, however, Ms. Littlefair was overwhelmed with overlapping family crises following the death of her father and sudden death of her brother-in-law. When she initially reached out to Mr. Singer in February 2017, it was for the right reasons: she needed help selecting and setting up online courses her son could complete online while working and traveling for the Treasury Department.[81]

Email correspondence from February 2017 shows that Ms. Littlefair sought Mr. Singer's assistance with "figur[ing] out what type of electives, what level etc, [her son] needs," and was relying upon Mr. Singer's claimed "experience with the On line college as well as papers on work study."[82] Mr. Singer also advised about the possibility of obtaining credit for her son's prior internships: "At issue is the university's accreditation and fitting the Internships into an independent study/directed study program that has units attached to it," and that "leaves us with the one or two other classes and getting approval for online courses at an accredited university .... The person to speak to is probably the VP of Academic Affairs."[83]

Ms. Littlefair acknowledges that she is solely responsible for her participation in the unlawful conduct that followed, and she is deeply remorseful and ashamed for having done it. Her terribly misguided effort to help her son graduate backfired miserably. As a mother, and a person who cares deeply about family and loves her son immensely, Ms. Littlefair has suffered

---

[81] PSR, ¶ 101; *see also* Julian Aff., Ex. J, Tabs 1-2.
[82] Julian Aff., Ex. J, Tab 1.
[83] Julian Aff., Ex. J, Tab 2 at 1.

intense grief and anxiety knowing that her misconduct led to her son's resignation from his ideal job, the revocation of his degree, as well as the public humiliation of her entire family.[84]

### B.     Available Sentences And The Advisory Guideline Range.

Ms. Littlefair is eligible for a sentence of "probation because the offense is a Class C Felony."[85] Moreover, "[s]ince the applicable guideline range is in Zone A of the Sentencing Table, a condition requiring a period of community confinement, home detention, or intermittent confinement may be imposed, but is not required."[86] 18 U.S.C. § 3553(a)(3) "directs the judge to consider sentences other than imprisonment." *Gall v. United States*, 552 U.S. 38, 58–59 (2007).

In *Gall*, the Supreme Court specifically endorsed the value of probation as a form of sentence: "Probation is not granted out of a spirit of leniency ...." *Gall*, 552 U.S. at 48 n.4 (internal citations and quotation omitted). "Offenders on probation are ... subject to several conditions that substantially restrict their liberty ... [m]ost probationers are also subject to individual 'special conditions' imposed by the court." *Id.* at 48. *Gall* not only tracks the intent of Congress to recognize the value of a probationary sentence, per the Sentencing Reform Act and § 3553(a), but also highlights the reasonableness of a district court's discretionary decision to impose probation instead of imprisonment. Probation restricts liberty, deters crime, and is amply retributive.

Probation with a condition of home detention is an available alternative to imprisonment and is appropriate under the unique facts of Ms. Littlefair's case. *See United States. v. Coughlin*, No. 06-20005, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008) (citing *Gall*, 552 U.S. at 47); *see also United States v. Ramos*, No. 04-cr-10275-NG, Dkt. 62-2 at 3–4, 6 (D. Mass. 2008) ("*Gall* recognized ... that probation is not nothing, that there are substantial restrictions on an

---

[84] PSR, ¶¶ 101, 102, 103.
[85] *Id.*, ¶ 129.
[86] *Id.*, ¶ 125.

individual's freedom in probation, that we can structure a probationary sentence that meets all the purposes of sentencing, and that is entirely appropriate," ordering time served of "essentially one day" and three years' supervised release for substantial OxyContin trafficking where guidelines range was 37 to 46 months).[87]

A sentence of probation is at the low-end of the 0- to 6-month advisory guideline range, well-within this Court's broad discretion, and would allow Ms. Littlefair to continue to care for her family members, while avoiding the likelihood of exposure to viral infections and attendant life-altering complications to which she is especially vulnerable. *United States v. Pagan-Ferrer*, 736 F.3d 573, 599 (1st Cir. 2013) (recognizing a "sentencing court's broad discretion …"); *see also United States v. Decora*, 177 F.3d 676, 679 (8th Cir. 1999) ("[T]he decision to impose probation is quintessentially a judgment call.") (internal quotations omitted). In light of the facts and circumstances discussed herein, the imposition of a non-custodial sentence would satisfy the statutory factors under 18 U.S.C. § 3553(a).

### C.    History And Character Of Ms. Littlefair.

Ms. Littlefair's history, character, and family circumstances support a sentence of probation. On a daily basis, she provides care, companionship, and assistance to her elderly mom and mother-in-law, and provides emotional support for her sister. Her heart for serving others in need—whether friends, neighbors, or complete strangers—is part and parcel of her essential character. In the words of one friend, Ms. Littlefair is "completely selfless, deeply loyal and seemingly always available to lend a helping hand ...."[88] Additionally, she has been a loving

---

[87]  *See also United States v. Huffman*, No. 19-cr-10117-IT, Dkt. 425 at 11-17 (D. Mass. 2019) (sentencing memorandum showing that the overwhelming majority of defendants in the 0- to 6-month range in this district and nationally are sentenced to non-incarceration sentences).
[88]  Letter of Ann Pelletier Lane ("Lane Ltr."), Julian Aff., Ex. A, Tab 17 at 1.

"second mom" to many in need, whether from crisis, lack, or loneliness.[89] These are all appropriate considerations for sentencing. *See United States v. Taylor*, 499 F.3d 94, 99 (1st Cir. 2007), *vacated on other grounds*, 552 U.S. 1092 (2008) (stating that the offender's extensive community involvement and good works militated against a higher sentence).

A sentence of probation with a condition of home confinement will permit Ms. Littlefair to continue to care for elderly family members, whereas incarceration would be a source of great disruption and grief for them. "A district court ... may take idiosyncratic family circumstances into account ... in fashioning a variant sentence." *United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008); *United States v. Gorsuch,* 404 F.3d 543, 548 (1st Cir. 2005) ("[I]n the post-*Booker* world, the sentencing guidelines are only advisory, and the district court may justify a sentence below the guideline level based upon a broader appraisal."); *see also United States v. Rangel*, 697 F.3d 795, 803 (9th Cir. 2012) ("Following *Booker*, ... district courts, employing factors listed under § 3553(a), have the discretion to weigh a multitude of mitigating ... factors," including "family ties and responsibilities.").

Ms. Littlefair's continuing vulnerabilities as a cancer survivor with extensive chest wall radiation put her at serious risk if incarcerated. Such risks include life threatening complications from viral infections, stress, and other factors, which may lead to lasting harm or contribute to a cancer recurrence. It would be devastating to Ms. Littlefair and her family if she were to suffer a lasting illness or medical complication that prevented her from continuing to care for her elderly family members. Home confinement would avoid such risks, and permit Ms. Littlefair's physicians to most effectively follow and manage her medical conditions. 18 U.S.C.

---

[89]  *See, e.g.,* Lane Ltr., Julian Aff., Ex. A, Tab 17 at 2 ("She was our daughter's second mom plain and simple"); Hahn Ltr., Julian Aff., Ex. A, Tab 15 at 1 ("[S]he became a second mom" to my son."); Letter of Debbie and John Crouch, Julian Aff., Ex. A, Tab 18 at 1 (provided "home cooked meals and a home away from home"); Letter of Laura Russel, Julian Aff., Ex. A, Tab 19 at 1 (providing support to acquaintance's husband and young boys when she was stranded in New York on 9/11); Ritchie K. Email, Julian Aff., Ex. K (referring to Ms. Littlefair as "mum").

§ 3553(a)(2)(D) (courts may consider the need to "provide the defendant with needed ... medical care ... in the most effective manner"). Finally, Ms. Littlefair's complete absence of any criminal history—no arrests, no convictions, and no violations of pre-trial release conditions—supports a probationary sentence.

### D.    Just Punishment, Promoting Respect For The Law, And Adequate Deterrence.

For Ms. Littlefair, a felony conviction and a sentence of probation is a severe sentence that will provide adequate deterrence and promote respect for the law.[90] The First Circuit has recognized that deterrence does not require incarceration. *See Prosperi*, 686 F.3d at 48 (noting with approval that the sentencing court "rejected the view that the interest in general deterrence could only be served by incarceration"). Indeed, the burdens of the criminal process alone on Ms. Littlefair will provide adequate specific deterrence. *See id.* Ms. Littlefair is now a convicted felon by virtue of her guilty plea. She will bear the stigma of a felony conviction for the rest of her life and the attendant publicity—available 24/7 on the internet—serves to deter others.

Ms. Littlefair has suffered the humiliation of publicly admitting her crime. She has had to explain to the people who depend upon her the that she faces the possibility of imprisonment. Knowledgeable observers confirm: (1) that Ms. Littlefair is "extremely remorseful for what she did ... [s]he and her poor mother and the rest of her family have already paid a huge price for this crime. Karen knows that her sterling reputation has been destroyed due to her actions, and her whole family is devastated,"[91] and (2) that Ms. Littlefair is "very regretful, ashamed and

---

[90]   Factors court consider under 18 U.S.C. § 3553(a)(2) when fashioning sentences include: (1) the "seriousness of the offense," "respect for the law," and "just punishment"; (2) "adequate deterrence"; and (3) "protect[ion] [of] the public." 18 U.S.C. § 3553(a)(2).
[91]   Hawthorne Ltr., Julian Aff., Ex. A, Tab 6 at 1-2.

humiliated by her actions. She has taken full responsibility for her actions and is very remorseful for the impact it has had on her family and their outstanding community reputation."[92]

Ms. Littlefair's strong familial relationships and friendships, as evidenced in the PSR and supporting letters, constitute strong evidence that she is not at risk to recidivate. *See United States v. Stern*, 590 F. Supp. 2d 945, 954 (N.D. Ohio 2008) (finding defendant's maintenance of "normal and productive relationships with his family, his friends" showed "a great likelihood that [he] will continue to be a positive and law-abiding member of society"). Taking into account all she has lost through her guilty plea to a federal felony charge, a sentence of probation more than satisfies the requirement of just punishment. Incarceration is not necessary to deter Ms. Littlefair from committing another crime, to protect the public, or to deter others.

### E.   Avoiding Unwarranted Sentencing Disparities.

A probationary sentence is also consistent with "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Academic cheating does not frequently result in federal prosecution. Where such cases have been brought in the District of Massachusetts, it is not uncommon for the court to impose a probationary sentence. For example, in *United States v. Wang*, No. 17-cr-10402-IT, the defendant used a counterfeit passport to take the GRE on behalf of another individual. Dkt. 16 at 1 (D. Mass. 2017). The government's criminal complaint alleged that the defendant had also acted as an imposter to take the Test of English as a Foreign Language ("TOEFL") on five other occasions. *Id*. Dkt. 4-1 at 3. The guidelines range was there, as here, 0 to 6 months. *See id*. Dkt. 30 at 6. The government recommended a three-month prison sentence, but the court imposed a one-year term of probation. *Id*. Dkt. 30 at 18, 34.

---

[92] Miner. Ltr., Julian Aff., Ex. A, Tab 3 at 2.

Similarly, in *United States v. Zhang*, No. 17-cr-10251-ADB, the defendant registered to take the TOEFL in order to gain admission at an English-speaking university, providing her registration information and Chinese passport to a co-conspirator to take the test using the defendant's identity. Dkt. 23 at 1-2 (D. Mass. 2017). The guidelines range was 6 to 12 months, and this Court imposed time served (one day). *Id*. Dkt. 37 at 2; Dkt. 38 at 1; *see also United States v. Huang*, No. 17-cr-10255-FDS, Dkt. 15; Dkt. 54 at 2; Dkt. 55 at 1 (D. Mass. 2017) (defendant paid an imposter to take the TOEFL on her behalf to secure admission to Pennsylvania State University; guideline range: 6 to 12 months; sentence: time served (one-day)); *United States v. Cheng*, No. 17-cr-10225-DJC, Dkt. 20 at 1-2; Dkt. 34 at 2; Dkt. 34-1 at 3 (D. Mass. 2017) (defendant paid an imposter to take the TOEFL on her behalf to secure admission to Arizona State University; guideline rang: 6 to 12 months; sentence: time served (one-day)).

In comparison to the seventeen parent-defendants that have been sentenced in the recent college pre-admissions prosecutions in this District, Ms. Littlefair is one of only three other parent-defendants who has received a government sentencing recommendation of four months or less.[93] These parent-defendants are Peter Sartorio, Felicity Huffman, and Marjorie Klapper. Ms. Littlefair's payment of *$9,000* for online course cheating at Georgetown is most comparable to the prosecutions of these parent-defendants, each of whom paid *$15,000* to participate in ACT/SAT cheating and received sentences of between one year probation and three weeks imprisonment, as follows:

- Mr. Sartorio paid $15,000 to participate in the college entrance exam cheating scheme and reportedly structured cash payments to make the crime untraceable and to avoid attracting attention at his bank.[94] The

---

[93] *See* Investigations of College Admissions and Testing Bribery Scheme, Dep't of Justice, *available at* https://www.justice.gov/usao-ma/investigations-college-admissions-and-testing-bribery-scheme.
[94] *See United States v. Sartorio*, No. 19-cr-10117-IT, Dkt. 312 at 24-25, Dkt. 513 at 2-3 (D. Mass. 2019).

government recommended *one month* imprisonment, but the court imposed *one year of probation*.[95]

- Ms. Huffman paid $15,000 to participate in the ACT/SAT test cheating scheme and later took steps to do it again for her second daughter.[96] The government recommended *one month*, but the court imposed *two weeks'* imprisonment.[97]

- Similarly, Ms. Klapper paid $15,000 to participate in an exam cheating scheme for her *younger son*, but also reportedly fabricated an explanation to the administrators of the SAT to prevent the cancellation of a *second*, *older son's* SAT score.[98] The government recommended *four months*, but the court imposed *three weeks'* imprisonment.[99]

Neither the academic-related TOEFL cheating cases, nor the ACT/SAT cheating cases, are on all fours with the facts of Ms. Littlefair's offense; however, these cases do present a baseline of examples showing that, even in the absence of Ms. Littlefair's unique family circumstances and medical vulnerabilities, the requested sentence of probation with a condition of home detention would "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Taking into consideration the additional factors of Ms. Littlefair's continuing care for elderly family members; the effect a prison sentence would have on such family members; and Ms. Littlefair's own medical vulnerabilities, a sentence of probation with home confinement is even more appropriate. Indeed, the government recently agreed to recommend a sentence of home confinement for a parent defendant that knowingly paid a large bribe to gain his child's admission to a university, citing "serious documented medical conditions involving Defendant's close family members."[100]

---

[95]  *Id*. Dkt. 548 at 12, 31.

[96]  *See United States v. Huffman*, No. 19-cr-10117-IT, Dkt. 312 at 17-19; Dkt. 423 at 25 (D. Mass 2019).

[97]  *Id*. Dkt. 424 at 1; Dkt. 446.

[98]  *See United States v. Klapper*, No. 19-cr-10177-IT, Dkt. 529 at 1 (D. Mass. 2019).

[99]  *Id*. Dkt. 529 at 1; Dkt. 565.

[100]  *United States v. Dameris*, No. 20-cr-10099-RGS, Dkt. 2 at 2 (D. Mass. 2020). According to a filed information, Peter Dameris paid $300,000 to participate in the college bribery scheme; however, in the plea agreement, the

IV.   **Conclusion**

The present case has already had devastating consequences for Ms. Littlefair and her family. The severe ramifications of a federal felony conviction are more than sufficient to promote respect for the law and deterrence in this case. She has no prior criminal history and is a respected and beloved mother, daughter, wife, and sister, as well as a kind and loving friend to those in need and her community. The otherwise caring and exemplary life Ms. Littlefair has led supports a sentence of probation, which will achieve the purposes of 18 U.S.C. § 3553(a) by appropriately punishing her while adequately taking into account the seriousness of the offense and the interests of promoting respect for the law, as well as deterring others from committing similar crimes, protecting the public, and avoiding unwarranted sentencing disparities. For all of these reasons, Ms. Littlefair respectfully requests that this Court enter a sentence of probation.

Date:   July 8, 2020

Respectfully submitted,

s/ Kenneth B. Julian
Kenneth B. Julian (*pro hac vice*)
Kathleen Wise (*pro hac vice*)
MANATT, PHELPS & PHILLIPS LLP
695 Town Center Drive, 14th Floor
Costa Mesa, CA 92626
(714) 338-2745
*kjulian@manatt.com*
*kwise@manatt.com*

Scott T. Lashway (MA Bar No. 655268)
Mara A. O'Malley (MA Bar No. 693946)
MANATT, PHELPS & PHILLIPS LLP
177 Huntington Ave., Suite 1700
Boston, MA 02115
(617) 646-1401
*slashway@manatt.com*
*MOMalley@manatt.com*

*Attorneys for Defendant Karen Littlefair*

---

government agreed to recommend a sentence of time served (one day), together with "21 months to be served as a period of home confinement," presumably so that Mr. Dameris can provide support, companionship, and care to the seriously ill family members. *Id.* Dkt. 1 at 3-5; Dkt. 2 at 2.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 8, 2020, a true copy of the foregoing document filed through the CM/ECF system was sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Mara A. O'Malley
Mara A. O'Malley

326350661.4